[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14177

_____

D.C. Docket No. 9:16-cv-81371-DMM

DENISE DEMARTINI,

Plaintiff-Appellant,

versus

TOWN OF GULF STREAM,
WANTMAN GROUP, INC.,
ROBERT A. SWEETAPPLE,

Defendants-Appellees,

RICHMAN GREER, P.A.,
GERALD F. RICHMAN,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 21, 2019)

Before ROSENBAUM, HULL and JULIE CARNES, Circuit Judges.

HULL, Circuit Judge:

Plaintiff Denise DeMartini appeals the district court's grant of summary judgment (1) to the defendant Town of Gulf Steam, Florida on her First Amendment retaliation claim brought under 42 U.S.C. § 1983 and (2) to the defendant Wantman Group, Inc., a government contractor, on her malicious prosecution claim brought under Florida law.

To place this appeal in context, we begin with what happened in a prior lawsuit and appeal involving the same parties here. See Town of Gulf Stream v. O'Boyle, 654 F. App'x 439 (11th Cir. 2016) (unpublished).

## I.    PRIOR LAWSUIT AND APPEAL

The Town of Gulf Stream ("the Town") is a "tiny town of under 1,000 residents and just 17 full time employees" in Palm Beach County, Florida. Id. at 441. In their prior lawsuit, the Town and its contractor, the Wantman Group Inc. ("Wantman") sued Denise DeMartini (the plaintiff here), Martin O'Boyle, and others under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), 1964(c), for a fraud and extortion scheme. Id. at 440–42.

O'Boyle resides in the Town. From 1984 until 1995, and then again from 2003 to 2015, DeMartini worked for O'Boyle's real estate company, CRO Realty,

2

Inc.  O'Boyle was DeMartini's direct supervisor and described her as his "left hand" woman.

At the direction of O'Boyle, Citizens Awareness Foundation, Inc. ("CAFI") was created as a not-for-profit corporation, whose stated purpose included testing and enforcing municipalities' compliance with Florida public records law. O'Boyle was the sole funder of CAFI and he used it as a tool to file thousands of public records requests to the Town under Florida's public records law.  Plaintiff DeMartini worked as CAFI's Treasurer and later Director.  O'Boyle's CRO Realty paid DeMartini for her work on behalf of CAFI.

In the prior lawsuit, the Town alleged that plaintiff DeMartini, O'Boyle, and others "pummeled the town with nearly 2,000 public records requests, many of them frivolous, with no intention of actually reviewing the results." Id.  The Town also alleged that, if the Town failed to timely respond then the O'Boyle Law Firm would sue the Town, allegedly "engag[ing] in a pattern of frivolous litigation activity." Id. at 441, 444.  The O'Boyle Law Firm was formed by O'Boyle's son, funded by O'Boyle, and was in the same building as O'Boyle's real estate company.  Here is how O'Boyle and DeMartini orchestrated their scheme through CAFI.[1]

---

[1]In the prior lawsuit, this Court stated that "[w]e derive these facts from the complaint's well-pled allegations, which we accept as true for purposes of the motions to dismiss." Gulf Stream, 654 F. App'x at 441 n.2.

3

**A.    First Step:  Public Records Requests**

As its first step, CAFI would issue public records requests "on a grand scale" to the Town, pursuant to Florida's Public Records Act, Fla. Stat. § 119.07. Id. at 444.  Specifically, § 119.07 provides that a custodian of a public record, such as the Town, (1) shall permit the record to be inspected and copied, at any reasonable time, under reasonable conditions, (2) must acknowledge requests to inspect or copy records promptly, and (3) must respond to such requests in good faith.  Fla. Stat. § 119.07(1)(a), (c).

As relevant here, CAFI sent the Town "nearly 2,000 public records requests."  Gulf Stream, 654 F. App'x at 441–42.  These public records requests were deliberately vague and ambiguous in order to induce a violation of § 119.07. See id.  Our prior decision listed examples of CAFI's requests as production of:

> (1) "All email addresses created or received by the Town of Gulf Stream";
>
> (2) "All phone numbers in the [T]own's records"; and
>
> (3) "Any and all records containing a social security number."

Id.

One of CAFI's requests went to Wantman, a contractor of the Town.  Id. at 442.  Florida's public records law applies also to private entities, such as Wantman, that contract with government agencies.  See Fla. Stat. § 119.0701.

4

CAFI sent Wantman a public records request by e-mail, which directed that a response be sent to this e-mail address: Vendor.Contract.Publishing@gmail.com. Citizens Awareness Found., Inc. v. Wantman Grp., Inc., 195 So. 3d 396, 397–98 (Fla. Dist. Ct. App. 2016).  CAFI's request was sent to the e-mail address of Robin Petzold, the consultant on the government contract, with the additional language "DidTheyReadIt.com" attached at the end of her e-mail address, rendering the e-mail address unrecognized by Wantman's computer network.  Id. at 397–98, 401.[2]  The subject line of the e-mail stated that it was a public records request, and it indicated that it was sent from "An Onoma."  Id. at 398.  The e-mail's suspicious appearance led Petzold to believe that it was illegitimate and spam, and she did not respond to it.  Id. at 401.

## B.    Second Step:  State Lawsuits Filed

The second step of CAFI's strategy involved the O'Boyle Law Firm's filing many lawsuits.  If the Town or Wantman did not respond promptly or adequately to the public records requests, CAFI, through the O'Boyle Law Firm, would threaten litigation, or actually file a lawsuit, against the Town or another entity.  CAFI, through the O'Boyle Law Firm, would demand unreasonable settlements, which included excessive amounts of attorney's fees and costs.  Gulf Stream, 654

---

[2]Neither the government contract nor Wantman's website identifies Petzold as a custodian of public records.  Citizens Awareness, 195 So. 3d at 401.

F. App'x at 441. The demands were based on threats that CAFI would initiate expensive and burdensome litigation or make pending litigation more expensive and burdensome. Id. The end game of the scheme was not to have the Town's public records actually released, but to obtain attorney's fees for the O'Boyle Law Firm. Id.

In that regard, Florida's Public Records Act, Fla. Stat. § 119.12, contains an attorney's fees provision that potentially applied when CAFI filed its lawsuits against the Town to enforce the production of public records. Section 119.12 provides that the state court shall award the reasonable costs of enforcement, including reasonable attorney's fees, against the custodian if the state court determines that: (a) the custodian unlawfully refused to permit a public record to be inspected or copied; and (b) the complainant provided written notice identifying the public record request to the custodian at least five business days before filing the civil action. Fla. Stat. § 119.12(1)(a), (b). "Unlawful refusal under [§] 119.12 includes not only affirmative refusal to produce records, but also unjustified delay in producing them." Yasir v. Forman, 149 So. 3d 107, 108 (Fla. Dist. Ct. App. 2014) (quotation omitted).[3] In short, if the Town or Wantman did not promptly

---

[3]As discussed later, the complainant does not recover attorney's fees (and instead has to pay attorney's fees) if the state court determines that the complainant requested to inspect or copy a public record or participated in the civil action for an "improper purpose." Fla. Stat. § 119.12(3). And "improper purpose" means a request to inspect or copy a public record or to

6

respond in five days, CAFI would file a lawsuit and demand attorney's fees. And it was the policy and practice of the O'Boyle Law Firm to demand settlement of cases with a provision for attorney's fees in excess of the fees actually incurred by the O'Boyle Law Firm for the cases.

As an example of the abusive litigation, in May 2014, when Wantman failed to respond to CAFI's e-mail request for records within the required time frame, CAFI filed suit after waiting merely 18 days and demanded several thousand dollars to settle the claim.[4] Citizens Awareness, 195 So. 3d at 401. After the suit was filed, Wantman voluntarily provided the requested records. Id. at 398. Nevertheless, CAFI persisted with the lawsuit. Id. at 397. The Florida state court concluded that Wantman's delay in providing the records was not so unjustifiable that it amounted to an unlawful refusal to provide the records to justify an award of attorney's fees. Id. at 397, 401. Affirming the trial court's ruling, the Florida appellate court noted that Wantman believed the request was "illegitimate" and stated that "[t]he public records law should not be applied in a way that encourages the manufacture of public records requests designed to obtain no response, for the purpose of generating attorney's fees." Id. at 401.

_____

participate in the civil action primarily to cause a violation of this chapter or for a frivolous purpose. Id.

    [4]Gerald Richman and the law firm Richman Greer represented Wantman in that lawsuit.

7

**C.    Joel Chandler's Role in CAFI**

In January 2014, O'Boyle recruited Joel Chandler to be CAFI's Executive Director.  While acting as CAFI's Executive Director, Chandler became convinced that CAFI was being used for improper purposes and that the organization was engaged in potentially fraudulent and illegal activities.  As a result, Chandler resigned from CAFI in June 2014, approximately five months after he accepted the position.

Within a few days after resigning from CAFI, Chandler contacted Robert Sweetapple, who was the Town's special counsel handling the public records requests.  Chandler told counsel Sweetapple that he believed CAFI, O'Boyle, and the O'Boyle Law Firm were victimizing the Town with their public records activities, and that those activities involved criminal, fraudulent, and unethical conduct.  Chandler also disclosed this information to the Town's attorney, Joanne O'Connor, as well as to the media.

In July 2014, Chandler met with Sweetapple, the Town's special counsel, and provided Sweetapple with documents and a sworn statement detailing CAFI's fraudulent conduct.  Chandler also gave Sweetapple a sworn video statement concerning his involvement with CAFI, O'Boyle, and the O'Boyle Law Firm.  Chandler advised Sweetapple about CAFI's two-step "windfall scheme" of (1) issuing deliberately vague and ambiguous public records requests to the Town and

8

other entities and (2) then demanding excessive amounts of attorney's fees and other costs to settle the dispute when the Town or other entities failed to respond to the public records requests in a timely manner.

Chandler informed counsel Sweetapple that O'Boyle had orchestrated hundreds of public records requests and directed the O'Boyle Law Firm to file numerous lawsuits on behalf of CAFI, many times without Chandler's authorization. Chandler reported that the O'Boyle Law Firm had settled cases on behalf of CAFI without having fee arrangements or contingency agreements in place, without closing statements, and without providing any accounting of the settlements to CAFI.

Chandler also explained that he became uneasy with DeMartini's close rapport with O'Boyle as well as her dual roles at the O'Boyle Law Firm and as a director of CAFI. Chandler's grievances against DeMartini included the following: (1) she chastised him for not supplying the O'Boyle Law Firm with sufficient cases from CAFI; (2) she worked with another employee to reject Chandler's pitch to refer CAFI's litigation to law firms besides the O'Boyle Law Firm; (3) CAFI adopted a policy that permitted DeMartini—a non-lawyer—to authorize public records requests and litigation; and (4) she demanded that Chandler produce a "minimum of 25 lawsuits" per week for the O'Boyle Law Firm.

9

After obtaining Chandler's sworn statement, Sweetapple compared it to the information he had already obtained through his own investigation and concluded that Chandler's account of CAFI's "windfall scheme" was credible.

## D.    RICO Civil Suit

With all of this information in hand, the Town decided to take action.  In October 2014, the Town held a regular meeting of its Commission to consider specific ways to thwart O'Boyle's "malicious and frivolous lawsuits and public records requests."  At the October 2014 meeting, the Town's attorney, Joanne O'Connor, advised the Commission that: (a) more than 1,500 public records requests had been submitted to the Town since August 27, 2013; (b) the Town believed that an overwhelming majority of those requests were submitted by O'Boyle, one other prolific requester, or entities that they controlled; (c) these requests resulted in 36 lawsuits against the Town; and (d) the requests had "barraged" the small town staff and, since January 2014, the Town had spent $370,000 in legal fees in defending those actions and responding to those requests.

At the October 2014 meeting, Scott Morgan, the Town's Mayor, explained that the Town was considering filing a RICO action and retaining attorney Gerald Richman and his law firm, Richman Greer, as special counsel.  At the meeting, Richman introduced himself, explaining to the Town that he was a past president of the Florida bar and an active trial lawyer with experience in RICO lawsuits.

10

Richman encouraged the Town to file a RICO action against the O'Boyle Law Firm, CAFI, and certain individuals.  Richman stated that the "best way to counteract" O'Boyle's operation was to "file a RICO action in federal court." Richman explained that the RICO action would seek injunctive relief and damages against the O'Boyle Law Firm, CAFI, and the individuals involved.

Mayor Morgan asked special counsel Richman about damages, and Richman responded that a successful RICO action would provide for attorney's fees and damages related to the costs of defending the public records lawsuits.  After Richman discussed his fee arrangement, Thomas Stanley, a Town Commissioner, asked Richman about other litigation costs.  Richman explained that there would be costs for depositions, interrogatories, and experts as the case progressed, but initially the costs would be related to the complaint, service, and class certification. Joan Orthwein, another Town Commissioner, asked special counsel Richman what the overall cost of the RICO litigation would be, and Richman estimated that it would cost between $20,000 and $25,000 in fees the first few months.  Donna White, also a Town Commissioner, asked Richman how long the RICO action would last, but Richman did not speculate.

Mayor Morgan stated that the Town "ha[d] suffered enough" by expending funds, time, resources, and morale and was encountering "difficulties [with] retaining and hiring employees as a result of the scandalously malicious and

11

frivolous lawsuits and public records requests filed by . . . O'Boyle under related entities." The Mayor explained that the Town could "either take the approach of defending these individual cases as they come in, and bleed to death by a thousand cuts, or . . . take steps necessary to stop those cases by advancing this case." The Mayor commented that there was a "conspiracy . . . to advance actions that essentially do nothing other than shake down municipal agencies and related contractors for funds" and "all the talk of open public access . . . is nonsense." He explained that "by putting a stop to it with this RICO action, we then put a stop to the individual lawsuits on the public records requests." The Mayor was "confident" that the RICO lawsuit would stop the individual lawsuits and public records requests.

Commissioner Orthwein responded, "I agree, because I don't see an end just defending one by one. I think we have to take it all as a group and go forward because just defending is not doing anything. . . . I think it's very important that we just don't bleed to death, we protect ourselves."

After the discussion, the Commission voted to retain Richman and his law firm, Richman Greer, as special counsel to represent the Town and to commence the civil lawsuit. Richman also contacted Wantman about whether it would join the RICO lawsuit. Richman had previously represented Wantman in other matters,

12

including a prior public records lawsuit involving CAFI.  Based on discussions

with Richman, Wantman decided to join the Town in the RICO civil suit.

On October 27, 2014, Sweetapple, as the Town's special counsel, obtained

Chandler's affidavit, which outlined the existence of O'Boyle's "windfall scheme"

and DeMartini's participation.

In February 2015, attorney Richman filed a civil complaint on behalf of the

Town and Wantman against O'Boyle, CAFI, DeMartini, and others, alleging

violations of RICO, 18 U.S.C. §§ 1962(c), 1964(c).[5]  In their complaint filed in

federal district court, the Town and Wantman, as named plaintiffs on behalf of a

putative class, alleged that the defendants (1) filed large numbers of frivolous

public records requests, which were often intentionally inconspicuous, (2) then

filed lawsuits when the requests were not addressed on time or otherwise, and

(3) then extorted their victims by demanding settlements, including payment of

their allegedly incurred attorney's fees and costs, or face protracted litigation and

additional frivolous public records requests and lawsuits.  The complaint alleged

the defendants' pattern of frivolous public records requests and frivolous lawsuits

was extortionate under the Hobbs Act, 18 U.S.C. § 1951.  The complaint also

---

[5]Before and after filing the RICO suit in federal court, the Town also filed counterclaims naming DeMartini and others as third-party defendants in eight pending state court actions that had been brought against the Town by O'Boyle and others alleging violations of Florida's public records law.

13

alleged that DeMartini was the self-appointed "key employee" for all of O'Boyle's companies, and that she "direct[ed] the flow of litigation" and "call[ed] the shots."

Upon motion to dismiss by the defendants, the federal district court dismissed the Town and Wantman's class action RICO complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  The district court concluded that the defendants' filing lawsuits, or even threatening to sue, did not constitute a predicate act under RICO.  In so ruling, the district court relied on Eleventh Circuit precedent in Raney v. Allstate Ins. Co., 370 F.3d 1086, 1087–88 (11th Cir. 2004) (holding that the filing of a lawsuit did not state a claim for extortion as a predicate act under RICO), and United States v. Pendergraft, 297 F.3d 1198, 1207 (11th Cir. 2002) (holding that neither the threat to litigate nor the fabrication of evidence behind the threat of a lawsuit made the action "wrongful" within the meaning of the Hobbs Act, and, thus, could not be a predicate act under RICO).

On appeal, the Town and Wantman attempted to distinguish our above precedent based on CAFI's thousands of abusive public records requests, the large volume of lawsuits actually filed or threatened to be filed, and the systematic use of those lawsuits as part of the O'Boyle-led scheme to defraud with the intent to deceive.  Gulf Stream, 654 F. App'x at 444.  This Court assumed that the defendants had "engaged in a pattern of frivolous litigation activity while abusing,

14

on a grand scale, their statutory right to request public documents from the government." Id. Ultimately, however, this Court affirmed the district court's dismissal of the Town and Wantman's complaint. Id. at 445. We stressed that the law encourages citizens to use the courts to redress wrongs and enforce rights, including to resolve public records disputes. Id. at 443–44. Moreover, citizens have a constitutional right to petition the government for redress under the First Amendment. Id. This Court concluded that, regardless of the scope and scale of the public records litigation, the courts are equipped with procedures to deal with parties who file frivolous litigation. Id. Therefore, this Court determined that a threat to file litigation against the government does not trigger liability under the Hobbs Act. Id. at 443. Nonetheless, this Court characterized the activities of CAFI, O'Boyle, and the O'Boyle Law Firm as "troubling." Id. at 441.

Meanwhile, Mayor Morgan sent a letter to town residents regarding the Town's operating budget, including a planned increase in the Town's budget for legal fees. After describing the status of the RICO civil lawsuit, Mayor Morgan said, "I have stated numerous times that if the litigants will discontinue their lawsuits, I will recommend discontinuing our RICO action." And when the Town lost on appeal, Mayor Morgan conceded during a public hearing held in July 2016 that the Town's RICO suit was "new to the law." In filing the RICO suit, the Town knew that it "would either prevail or expose the case." But "something had

15

to be done to try to stop the public record lawsuits that at that time numbered 53 against the Town." Mayor Morgan also reported that the Town had not had a public records lawsuit since the RICO action was filed.

## E.    DeMartini's § 1983 Retaliation Case

Approximately two months after this Court affirmed the district court's dismissal of the Town and Wantman's RICO civil action, DeMartini filed the instant § 1983 action against them. In relevant part, DeMartini's amended complaint alleged that the Town and Wantman's RICO lawsuit constituted unlawful retaliation against her. Her amended complaint contained: (1) a First Amendment retaliation claim under § 1983 against the Town; and (2) a malicious prosecution claim under Florida law against Wantman.[6]

As to her § 1983 First Amendment retaliation claim, DeMartini alleged that the speakers at the Town's October 2014 Commission meeting made clear that the Town was not concerned with the merits of its RICO lawsuit or its likelihood of success. Rather, the Town's sole motivation in voting for the RICO lawsuit was to stop CAFI's filing of public records lawsuits. DeMartini noted that, after this Court affirmed the dismissal of the Town's RICO complaint, Mayor Morgan

---

[6]DeMartini's amended complaint also alleged Florida malicious prosecution claims against Richman and his law firm Richman Greer and slander per se claims against Sweetapple and Richman. The district court granted summary judgment for these defendants. On appeal, DeMartini does not raise these claims against these defendants, and, therefore, we do not address them.

16

admitted at a July 2016 Commission meeting that the Town's RICO lawsuit served its purpose because new public records lawsuits had not been filed, which "was exactly what we tried to accomplish."

DeMartini contended that she engaged in speech that was constitutionally protected by associating with CAFI, which had filed the multiple public records lawsuits against the Town. DeMartini alleged that: (1) the filing of these public records lawsuits against the Town, at her direction, constituted constitutionally protected activity; (2) the Town retaliated against her protected activity by filing the RICO lawsuit; and (3) the Town's retaliatory conduct adversely affected her protected activity and caused her to incur substantial damages, primarily due to the loss of her employment.

As to her Florida malicious prosecution claim against Wantman, DeMartini alleged that Wantman disliked her petitioning the government by using Florida's public records law and weaponized the RICO suit as a means to punish her for that expression. She claimed that Wantman sued her without having any evidence that she had any involvement or participation in the extortionate scheme alleged in the RICO complaint.

The district court denied the defendants' motions to dismiss. Later, the defendants moved for summary judgment on all claims and DeMartini filed a cross-motion for partial summary judgment against Wantman. The district court

17

granted the defendants' motions for summary judgment and denied DeMartini's cross-motion against Wantman.  The district court concluded the defendants had probable cause to initiate a civil RICO lawsuit which precluded plaintiff's § 1983 First Amendment retaliation claim and her Florida malicious prosecution claim.  DeMartini timely appealed.[7]

## II.    SECTION 1983 FIRST AMENDMENT RETALIATION CLAIM

## A.    First Amendment

"A constitutional claim brought pursuant to § 1983 must begin with the identification of a specific constitutional right that has allegedly been infringed." Paez v. Mulvey, 915 F.3d 1276, 1285 (11th Cir. 2019).  Plaintiff DeMartini alleges that the defendants violated her First Amendment rights—to make public records requests and to bring lawsuits—by filing the RICO civil action against her in retaliation for her exercising those First Amendment rights.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or . . . the right . . . to petition the government for a redress of grievances."  U.S. Const. Amend. I.  The Amendment

---

[7]We review a grant of summary judgment de novo and apply the same legal standards that governed the district court's decision.  Ave. CLO Fund, Ltd. v. Bank of Am., N.A., 723 F.3d 1287, 1293 (11th Cir. 2013).  Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Also, we may affirm for any reason supported by the record, even if not relied upon by the district court.  United States v. Al-Arian, 514 F.3d 1184, 1189 (11th Cir. 2008).

protects "not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). "The First Amendment right to petition the government for a redress of grievances includes a right of access to the courts." Bank of Jackson Cty. v. Cherry, 980 F.2d 1362, 1370 (11th Cir. 1993); see Cal. Motor Transp. Co., v. Trucking Unlimited, 404 U.S. 508, 510, 92 S. Ct. 609, 612 (1972) (stating "[t]he right of access to the courts is indeed but one aspect of the right of petition"). The right to petition the government for a redress of grievances is "one of the most precious of the liberties safeguarded by the Bill of Rights," and is "high in the hierarchy of First Amendment values." Lozman v. City of Riviera Beach, Fla., 585 U.S. __, __, 138 S. Ct. 1945, 1954–55 (2018) (internal quotation marks omitted) (quoting BE & K Const. Co., v. NLRB, 536 U.S. 516, 524, 122 S. Ct. 2390, 2395 (2002)); see also Connick v. Myers, 461 U.S. 138, 145, 103 S. Ct. 1684, 1689 (1983). The right to petition the government for redress of grievances is such a fundamental right as to be "implied by '[t]he very idea of a government, republican in form.'" BE & K Const., 536 U.S. at 524–25, 122 S. Ct. at 2396 (quoting United States v. Cruikshank, 92 U.S. 542, 552 (1875)). In short, a citizen's public records requests and lawsuits against the government can clearly constitute protected First Amendment activity.

19

## B.      Elements of Retaliation Claim

To state a § 1983 First Amendment retaliation claim, a plaintiff generally must show: (1) she engaged in constitutionally protected speech, such as her right to petition the government for redress; (2) the defendant's retaliatory conduct adversely affected that protected speech and right to petition; and (3) a causal connection exists between the defendant's retaliatory conduct and the adverse effect on the plaintiff's speech and right to petition.  Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).[8]

In § 1983 First Amendment retaliation cases, the Supreme Court has recognized that retaliatory animus by a governmental actor is a subjective condition that is "easy to allege and hard to disprove."  See Nieves v. Bartlett, 587 U.S. __, __, 139 S. Ct. 1715, 1725 (2019) (internal quotation marks omitted) (quoting Crawford-El v. Britton, 523 U.S. 574, 585, 118 S. Ct. 1584, 1590 (1998)); see also Hartman v. Moore, 547 U.S. 250, 257, 126 S. Ct. 1695, 1702 (2006) (The defendant inspectors argue that "a plaintiff can afflict a public officer with disruption and expense by alleging nothing more, in practical terms, than action

---

[8]When reviewing an official's retaliatory conduct for adverse effect on protected speech, we consider whether the Town's alleged retaliatory conduct "would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  Bailey v. Wheeler, 843 F.3d 473, 481 (11th Cir. 2016).  However, we have acknowledged that special concerns arise when an official's "own First Amendment rights are implicated" in the commission of an alleged constitutional tort.  Dixon v. Burke Cty., 303 F.3d 1271, 1275 (11th Cir. 2002).

20

with a retaliatory animus, a subjective condition too easy to claim and too hard to defend against."). For this reason, courts have identified two general approaches to retaliation claims against governmental actors, with the particular approach chosen dependent on the type of alleged retaliation at issue. One approach, typically used when a governmental employee claims that he was fired because he engaged in First Amendment activity, looks to whether the defendant governmental employer's retaliatory motivation was the but-for cause of the adverse employment decision. If not—that is, if the defendant would have taken the same action had there not also been a retaliatory animus motivating that conduct—then the defendant is not liable. Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285–87, 97 S. Ct. 568, 575–76 (1977); see Lozman, 585 U.S. at __, 138 S. Ct. at 1955.

The second approach—taken when the governmental defendant has utilized the legal system to arrest or prosecute the plaintiff—has been to require the plaintiff to plead and prove an absence of probable cause as to the challenged retaliatory arrest or prosecution in order to establish the causation link between the defendant's retaliatory animus and the plaintiff's injury. Nieves, 587 U.S. at __, 139 S. Ct. at 1726; Hartman, 547 U.S. at 260–61, 265–66, 126 S. Ct. at 1704, 1706–07.

These four major Supreme Court precedents—Mt. Healthy, Hartman,

Lozman, and Nieves—expand upon the causal connection requirement in First

Amendment retaliation cases and are necessary background to our ultimate

conclusion.  We start with the First Amendment retaliation decisions in Mt.

Healthy and Hartman.

## C.    1977 Mt. Healthy: "But-For" Test When Retaliatory Employment Actions are Alleged

Mt. Healthy involved a government employer's discharge of a public

employee.  Mt. Healthy, 429 U.S. at 276, 97 S. Ct. at 570.  Specifically, in Mt.

Healthy, a city board of education (the "school board") decided not to rehire an

untenured school teacher after various incidents indicating unprofessional

demeanor.  Id. at 281–83, 97 S. Ct. at 573–74.  One incident was a telephone call

the teacher made to a local radio station to report on a new school policy.  Id. at

282, 95 S. Ct. at 573.  The plaintiff teacher sued the school board, claiming that the

board's refusal to renew his employment contract violated his First Amendment

rights.  Id. at 276, 97 S. Ct. at 570.  Because the school board did not suggest that

the teacher violated any established policy in making the call, the Supreme Court

accepted a finding by the district court that the call was protected speech under the

First Amendment.  Id. at 284, 97 S. Ct. at 574.

In Mt. Healthy, the Supreme Court went on to hold, however, that since the other incidents, standing alone, would have justified the plaintiff teacher's dismissal, relief could not be granted to the teacher if the school board could show that the discharge would have been ordered even without reference to the teacher's protected speech. Id. at 285–87, 97 S. Ct. at 575–76. In terms of precepts in the law of torts, the Supreme Court held that even if retaliation might have been a "substantial factor" or a "motivating factor" for the board's decision not to rehire the plaintiff, still there was no liability unless the alleged constitutional violation was a but-for cause of the employment termination. See id.

After a bench trial, the district court awarded reinstatement with backpay to the plaintiff teacher. Id. at 276, 97 S. Ct. at 570. The Supreme Court vacated the district court's favorable judgment for the plaintiff teacher because, as to causation, the district court should have gone on to determine whether the school board had shown that "it would have reached the same decision as to [the plaintiff's] reemployment even in the absence of the [plaintiff's] protected [speech]." Id. at 285–87, 97 S. Ct. at 575–76. Although the plaintiff had shown that his conduct (the call) was protected speech and that his conduct was a substantial or motivating factor in the school board's decision not to rehire him, the school board was not liable if it showed it would have reached the same decision in the absence of the plaintiff's protected speech. See id.

23

**D.    2006 Hartman: First Amendment—Retaliatory Criminal Prosecution Claims Require the Absence of Probable Cause**

After adopting the "but for" test when a public employee alleges retaliation by the governmental employer based on the employee's protected First Amendment activity, the Supreme Court addressed the test that should apply when a citizen alleges that he or she has been criminally prosecuted in retaliation for First Amendment activity.  In Hartman, the Supreme Court recognized the importance that the existence of probable cause plays in assessing causation in a retaliatory prosecution claim and held that a viable retaliatory prosecution claim requires the plaintiff to plead and prove the absence of probable cause.  Hartman, 547 U.S. at 252, 265–66, 126 S. Ct. at 1699, 1707.  The Supreme Court's analysis in reaching that holding is instructive.

The plaintiff in Hartman engaged in an extensive lobbying campaign opposing a particular postal service policy.  Id. at 252–53, 126 S. Ct. at 1699–1700.  The Postal Service criminally prosecuted the plaintiff for violating federal statutes in that lobbying.  Id. at 253–54, 126 S. Ct. at 1700.  After being acquitted, the plaintiff filed a § 1983 suit against the prosecutor and five postal inspectors, alleging that they violated his First Amendment rights when they instigated his criminal prosecution in retaliation for his criticisms of the Postal Service.  Id. at 254, 126 S. Ct. at 1700.

24

In Hartman, the Supreme Court held that, to establish the causal connection required for a § 1983 First Amendment retaliation claim predicated on a retaliatory criminal prosecution, a plaintiff must plead and prove more than the subjective retaliatory animus of a government official and a plaintiff's subsequent injury; the plaintiff must also plead and prove the absence of probable cause for the underlying retaliatory criminal prosecution. Id. at 260–61, 265–66, 126 S. Ct. at 1704, 1706–07.[9]

In reaching this conclusion, the Supreme Court reasoned that when the claimed retaliation for protected First Amendment conduct is a criminal charge, a constitutional tort action for retaliation will differ in two ways from the standard First Amendment retaliation claim, such as a public employee's claim that he was fired for criticizing the government. Id. at 260, 126 S. Ct. at 1704. What is different about a criminal prosecution case is that: (1) "the requisite causation between the defendant's retaliatory animus and the plaintiff's injury is usually more complex than it is in other retaliation cases, and the need to show this more complex connection supports a requirement that no probable cause be alleged and

---

[9]Prior to Hartman, both this Court and the Fifth Circuit had already held that the presence of probable cause defeats a § 1983 First Amendment claim for retaliatory criminal prosecution. See Wood v. Kesler, 323 F.3d 872, 882–883 (11th Cir. 2003) (concluding a plaintiff's § 1983 claim for retaliatory criminal prosecution in violation of the First Amendment is "defeated by the existence of probable cause"); Keenan v. Tejeda, 290 F.3d 252, 260 (5th Cir. 2002) (noting that "retaliatory criminal prosecutions in violation of the First Amendment are actionable only if a plaintiff can also prove the common-law elements of malicious prosecution, including the absence of probable cause to prosecute").

proven"; and (2) "there will always be a distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation, namely evidence showing whether there was or was not probable cause to bring the criminal charge." Id. at 261, 126 S. Ct. at 1704.

As to causation, the Supreme Court in Hartman explained that in retaliatory criminal prosecutions, the causal connection is more complex because it "is not merely between the retaliatory animus of one person and that person's own injurious action, but between the retaliatory animus of one person [the postal inspector] and the action of another [the prosecutor]." Id. at 262, 126 S. Ct. at 1705. The Supreme Court also emphasized that "to the factual difficulty of divining the influence of an investigator or other law enforcement officer upon the prosecutor's mind, there is an added legal obstacle in the longstanding presumption of regularity accorded to prosecutorial decisionmaking." Id. at 263, 126 S. Ct. at 1705. The Supreme Court concluded that the absence of probable cause was needed to "bridge the gap between the nonprosecuting government agent's [the postal inspector] motive and the prosecutor's action, and to address the presumption of prosecutorial regularity." Id. at 263, 126 S. Ct. at 1706.[10]  Thus,

---

[10]The Supreme Court contrasted the dual actors in retaliatory criminal prosecution cases with "the requisite causation in ordinary retaliation claims, where the government agent allegedly harboring the animus is also the individual allegedly taking the adverse action." Hartman, 547 U.S. at 259, 126 S. Ct. at 1703.

26

even when a government officer's retaliatory animus is clear, it "does not necessarily show that the [officer] induced the action of a prosecutor who would not have pressed charges otherwise." Id. at 263, 126 S. Ct. at 1705.

Ultimately, the Supreme Court in Hartman concluded: "Because showing an absence of probable cause will have high probative force, and can be made mandatory with little or no added cost,[11] it makes sense to require such a showing as an element of a plaintiff's case, and we hold that it must be pleaded and proven." Id. at 265–66, 126 S. Ct. at 1707.  Under Hartman, if there is probable cause for the underlying criminal prosecution, then the § 1983 First Amendment retaliatory criminal prosecution case ends as a matter of law. See id.  The Supreme Court, in effect, imposed an "'objective' fact requirement" on the plaintiff—to plead and prove the absence of probable cause—in order to prove the chain of causation from animus to injury. See id. at 258, 265–66, 126 S. Ct. at 1702, 1707.

E.    **2018 Lozman: Holding That, Given the Unique Facts of the Case, the Existence of Probable Cause Did Not Bar Lozman's First Amendment Retaliatory Arrest Claim**

More recently, in Lozman, the Supreme Court examined whether the existence of probable cause will also defeat a § 1983 First Amendment claim for

---

[11]The Supreme Court found the plaintiff's duty to plead and prove the absence of probable cause would essentially be "cost free" because the issue of probable cause will be "an evidentiary issue in practically all such cases."  Hartman, 547 U.S. at 265, 126 S. Ct. at 1707.

retaliatory arrest.[12]  Lozman, 585 U.S. at __, __, 138 S. Ct. at 1951, 1955.

Although granting certiorari on that broad question, ultimately the Supreme Court

itself limited its Lozman decision to the particular facts in that case.  Id. at __, 138

S. Ct. at 1955.

The Court first reviewed its own prior decisions in both Mt. Healthy and

Hartman and its prior stated reasons for them.  See id. at __, 138 S. Ct. at 1952–53.

After doing so, the Court concluded that "[o]n facts like these, Mt. Healthy

provides the correct standard for assessing a retaliatory arrest" and plaintiff

"Lozman need not prove the absence of probable cause to maintain a claim of

retaliatory arrest against the City."  Id. at __, 138 S. Ct. at 1955.  The Supreme

Court cautioned, however: "The Court need not, and does not, address the elements

required to prove a retaliatory arrest claim in other contexts."  Id.  The Supreme

Court added "whether in a retaliatory arrest case the Hartman approach should

apply, thus barring a suit where probable cause exists, or, on the other hand, the

inquiry should be governed only by Mt. Healthy is a determination that must await

a different case."  Id. at __, 138 S. Ct. at 1954.  The Court explained the reason

---

[12]Previously in 2012, the Supreme Court granted certiorari on the question "whether a First Amendment retaliatory arrest claim may lie despite the presence of probable cause to support the arrest," but the Supreme Court declined to address that question in that earlier case. See Reichle v. Howards, 566 U.S. 658, 663, 132 S. Ct. 2088, 2093 (2012).

was that "Lozman's claim is far afield from the typical retaliatory arrest claim" and "the mine run of arrests." Id.

Because the "unique" facts in Lozman drove that decision, we detail them. See id. In Lozman, the plaintiff Lozman had filed a previous civil lawsuit contending that the City violated the state's open-meetings laws. Id. at __, 138 S. Ct. at 1949. In June 2006, the City Council held a meeting at which Councilmember Wade suggested the City use its resources to "intimidate" Lozman, who had filed the open-meeting lawsuit. Id. A different Councilmember asked whether there was "a consensus of what Ms. Wade [was] saying" and others responded in the affirmative. Id. Lozman alleged this formed an official plan to retaliate against him. Id. On the other hand, the City maintained that the only consensus reached during the meeting was to invest the money and resources necessary to prevail in the litigation against it. Id.

Five months later, in November 2006, plaintiff Lozman came to a City council meeting and gave remarks about the recent arrest of a former county official. Id. When Councilmember Wade directed Lozman to stop, he continued speaking, this time about the arrest of a former city official in West Palm Beach. Id. Councilmember Wade directed a police officer to "carry him out"—i.e., arrest him. Id. at __, 138 S. Ct. at 1949–50. Before the Supreme Court, there was no

29

dispute that the officer had probable cause to arrest the plaintiff for interrupting the meeting.  Id. at __, 138 S. Ct. at 1951.

Nonetheless, plaintiff Lozman alleged that the high-level City policymakers in advance of the meeting had devised a retaliatory plan to arrest him because of his open-meetings lawsuit against the City and prior public criticism of public officials.  Id.  Pursuant to that alleged official policy, when Lozman spoke up at the next council meeting, Councilmember Wade directed police officers to arrest him. Id. at __, 138 S. Ct. at 1949–50.  After a 19-day trial, the jury returned a verdict for the City on all claims.  Id. at 1950.

During the trial, the district court charged the jury that plaintiff Lozman must "prove that the arresting officer was himself motivated by impermissible animus against Lozman's protected speech and that the officer lacked probable cause to make the arrest."  Id.  The district court "allowed the jury to decide whether there was probable cause to arrest [Lozman] for the public-disturbance offense."  Id.  On appeal, this Court affirmed the verdict for the City because the existence of probable cause defeated Lozman's First Amendment retaliatory arrest claim.  Id.  We also assumed that the district court erred in instructing the jury that the officer, rather than the City, must have harbored retaliatory animus.  However, we concluded that error was harmless given that the jury had found the officer had probable cause for the arrest.  Id.  The Supreme Court granted certiorari on the

30

question of "whether the existence of probable cause defeats a First Amendment claim for a retaliatory arrest." Id. at __, 138 S. Ct. at 1950–51.

For purposes of its discussion, the Supreme Court assumed Lozman's "arrest was taken pursuant to an official city policy," but added "whether there was such a policy and what its content may have been are issues not decided here." Id. at __, 138 S. Ct. at 1951. Even though there was probable cause for Lozman's arrest, the Court ultimately concluded that the "unique" facts of the case warranted allowing Lozman to proceed on his claim that the City had engaged in an "official" policy of retaliation against him based on his First Amendment activity. Id. at __, 138 S. Ct. at 1954–55.

Explaining its reasoning, the Court identified five considerations that justified allowing Lozman's First Amendment retaliation claim to proceed even though there was probable cause for his arrest. Id. at __, 138 S. Ct. at 1949, 1954–55. Those five considerations were: (1) plaintiff Lozman had alleged "more governmental action than simply an [officer's] arrest" because he claimed that the City "itself retaliated against him pursuant to an 'official municipal policy' of intimidation"; (2) the plaintiff had alleged that the City's retaliation plan was "premeditated" and formed months earlier (before the arrest); (3) the plaintiff had "objective evidence" of a policy motivated by retaliation, as he had a transcript of a closed-door meeting where a Councilmember stated that the City should use its

31

resources to "intimidate" Lozman and others who filed lawsuits against the City; (4) there was less of a concern about the causation problem and opening the floodgates of frivolous retaliation claims because the City's official policy of retaliation was formed months earlier, there was little relation between the "protected speech that prompted the retaliatory policy and the criminal offense (public disturbance) for which the arrest was made," and "it was unlikely that the connection between the alleged animus and injury will be weakened by an official's legitimate consideration of speech"; and (5) the plaintiff's speech—the right to petition—was "one of the most precious of the liberties safeguarded by the Bill of Rights" and was "high in the hierarchy of First Amendment values." Id.

Although holding that plaintiff Lozman could sue for retaliatory arrest "[o]n facts like these," the Supreme Court emphasized that its holding was limited to the alleged facts of Lozman's case and cautioned that it was not deciding whether, as a general matter, the causation standard in Mt. Healthy or the lack-of-probable-cause element in Hartman applied to retaliatory arrest claims. Id. at __, 138 S. Ct. at 1954–55. The Supreme Court also left it to this Court on remand to decide whether Lozman "is ultimately entitled to relief or even a new trial." Id. at __, 138 S. Ct. at 1955. Because the Supreme Court had only assumed that there was an official retaliatory policy and that the arrest was taken pursuant to that official city

32

policy, the Supreme Court stated that on remand, among other matters, this Court may wish to consider:

> (1) whether any reasonable juror could find that the City actually formed a retaliatory policy to intimidate Lozman during its June 2006 closed-door session; (2) whether any reasonable juror could find that the November 2006 arrest constituted an official act by the City; and (3) whether, under Mt. Healthy, the City has proved that it would have arrested Lozman regardless of any retaliatory animus—for example, if Lozman's conduct during prior city council meetings had also violated valid rules as to proper subjects of discussion, thus explaining his arrest here.

Id.

### F.    2019 Nieves: First Amendment Retaliatory Arrest Claims Generally Require the Absence of Probable Cause

Shortly after Lozman, the Supreme Court had an opportunity to decide the question that it had left open in that case: which standard, the Mt. Healthy standard or the Hartman standard, should govern a § 1983 First Amendment retaliatory arrest case.  In this case, Nieves, the Court opted for the Hartman test: the presence of probable cause will typically invalidate a First Amendment retaliatory arrest claim.  Nieves, 587 U.S. at __, __, 139 S. Ct. at 1723–24, 1726.  The Court explained that because, generally speaking, "retaliatory arrest claims involve [the same] causal complexities akin to those" in Hartman, which concerned a First Amendment claim based on a retaliatory criminal prosecution, likewise "[t]he presence of probable cause should generally defeat a First Amendment retaliatory arrest claim."  Id.

33

In <u>Nieves</u>, plaintiff Bartlett was arrested by two police officers, Luis Nieves and Bryce Weight, for disorderly conduct and resisting arrest during a rowdy winter sports festival held in Alaska. <u>Id.</u> at __, 139 S. Ct. at 1720–21.  According to Officer Nieves, he was speaking with a group of festival attendees when a seemingly intoxicated Bartlett started shouting at the attendees not to talk to the police. <u>Id.</u> at __, 139 S. Ct. at 1720.  When Officer Nieves approached him, Bartlett yelled at Officer Nieves to leave. <u>Id.</u>  Rather than escalate the situation, Officer Nieves left. <u>Id.</u>  Bartlett disputed that account, claiming that he was not drunk and did not yell at Officer Nieves. <u>Id.</u>

Officer Weight stated that, several minutes later, Bartlett approached him in an aggressive manner while Officer Weight was questioning a minor about underaged drinking, stood between Officer Weight and the minor, and yelled with slurred speech that Officer Weight should not speak with the minor. <u>Id.</u>  When Bartlett stepped toward him, Officer Weight pushed Bartlett back. <u>Id.</u>  Officer Nieves saw the confrontation and initiated Bartlett's arrest. <u>Id.</u> at __, 139 S. Ct. at 1720–21.  When Bartlett was slow to comply, the officers forced him to the ground and threatened to tase him. <u>Id.</u> at __, 139 S. Ct. at 1721.  Bartlett denied being aggressive and claimed that he stood close to Officer Weight in order to speak over the music and was slow to comply because he did not want to aggravate a back injury. <u>Id.</u>  After being handcuffed, Bartlett claimed that Officer Nieves said: "Bet

34

you wish you would have talked to me now." Id. (alteration accepted). The officers then took Bartlett to a holding tent and charged him with disorderly conduct and resisting arrest. Id. After a few hours, Bartlett was released from custody, and the state later dismissed the criminal charges against him. Id.

Subsequently, in a § 1983 action, Plaintiff Bartlett sued the officers for violation of his First Amendment rights by arresting him in retaliation for his speech—his refusal to speak with Officer Nieves earlier in the evening and his intervention in Officer Weight's discussion with the minor. Id. The officers stated that they arrested Bartlett because he interfered with an investigation and initiated a physical confrontation with Officer Weight. Id. The district court granted summary judgment to the officers because (1) "the officers had probable cause to arrest Bartlett," and (2) "the existence of probable cause precluded Bartlett's First Amendment retaliatory arrest claim." Id. The Ninth Circuit disagreed, holding that Bartlett had presented enough evidence that his speech was a "but-for cause" of the arrest. Bartlett v. Nieves, 712 F. App'x 613, 616 (9th Cir. 2017) (unpublished).

In Nieves, the Supreme Court reversed the Ninth Circuit and held "[b]ecause there was probable cause to arrest Bartlett, his retaliatory arrest claim fails as a matter of law." Nieves, 587 U.S. at __, 139 S. Ct. at 1728. The Court acknowledged that retaliatory arrests cases do not present a "presumption of

35

prosecutorial regularity" or "multiple government actors," which are factors that are found in retaliatory prosecution cases and support a probable cause standard. Id. at __, 139 S. Ct. at 1724. Nonetheless, the Court concluded that, like in retaliatory prosecution cases, the causal inquiry in retaliatory arrests cases is complex because "protected speech is often a 'wholly legitimate consideration' for officers when deciding whether to make an arrest." Id. at __, 193 S. Ct. at 1723–24. Thus, the Court concluded that "[t]he plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." Id.

In addition, the Supreme Court in Nieves reasoned that, "'[l]ike retaliatory prosecution cases, evidence of the presence or absence of probable cause for the arrest will be available in virtually every retaliatory arrest case.'" Id. at __, 139 S. Ct. at 1724 (quoting Reichle, 566 U.S. at 668, 132 S. Ct. at 2095). "And because probable cause speaks to the objective reasonableness of an arrest, its absence will—as in retaliatory prosecution cases—generally provide weighty evidence that the officer's animus caused the arrest, whereas the presence of probable cause will suggest the opposite." Id. (internal citation omitted).

The Supreme Court therefore concluded that "[t]he presence of probable cause should generally defeat a First Amendment retaliatory arrest claim." Id. at __, 139 S. Ct. at 1726. On the other hand, the Supreme Court also instructed that if the plaintiff demonstrates the absence of probable cause, "the Mt. Healthy test

36

governs: The plaintiff must show that the retaliation was a substantial or motivating factor behind the arrest, and, if that showing is made, the defendant can prevail only by showing that the arrest would have been initiated without respect to retaliation." Id. at __, 139 S. Ct. at 1725 (internal citations, alterations, and quotation marks omitted).

Examining specifically the arrest of the plaintiff Bartlett, the Supreme Court in Nieves concluded that, "[b]ecause there was probable cause to arrest [plaintiff] Bartlett, his retaliatory arrest claim fails as a matter of law." Id. at __, 139 S. Ct. at 1728. In reaching this conclusion, the Supreme Court examined the two "common law torts that provide the closest analogy to retaliatory arrest claims": false imprisonment and malicious prosecution. Id. at __, 139 S. Ct. at 1726 (internal quotation marks omitted). Although the parties disputed which tort was the better analog, the Supreme Court concluded that both common law torts suggested the same result, which is that a plaintiff must show the absence of probable cause. Id. The Supreme Court explained that "[i]t has long been settled law that malicious prosecution requires proving the want of probable cause." Id. (internal quotation marks omitted). And for a false imprisonment claim, "the presence of probable cause was generally a complete defense for peace officers." Id.[13] Relying in part

_____

[13]"At common law, peace officers were privileged to make warrantless arrests based on probable cause of the commission of a felony or certain misdemeanors." Nieves, 587 U.S. at __, 139 S. Ct. at 1726. "Although the exact scope of the privilege varied somewhat depending on

37

on these two common law analogs, the Supreme Court held the defendant officers were entitled to summary judgment on plaintiff Bartlett's § 1983 First Amendment claims for retaliatory arrest because there was probable cause to arrest him. Id. at __, 139 S. Ct. at 1726–28.

One final observation about Nieves. Although probable cause defeated plaintiff Bartlett's retaliatory arrest claim, the Supreme Court issued a caveat, albeit in dicta, about that holding. The Supreme Court explained that, although probable cause generally defeats a retaliatory arrest claim, "a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." Id. at __, 139 S. Ct. at 1727.[14] In those types of cases, "an unyielding requirement to show the absence of probable cause could pose a risk that some police officers may exploit the arrest power as a means of suppressing speech." Id. (internal quotation marks omitted).

Therefore, in Nieves the Supreme Court carved out a narrow exception to

---

the jurisdiction, the consistent rule was that officers were not liable for arrests they were privileged to make based on probable cause." Id. at __, 139 S. Ct. at 1727.

[14]The Supreme Court noted that given the present power of police officers to make warrantless arrests for misdemeanors for even very minor offenses, such as jaywalking, the existence of probable cause for an arrest on such an offense would do little to disprove that a retaliatory motive prompted the arrest for an arrestee who had, for example, vocally complained about police conduct. Nieves, 587 U.S. at __, 139 S. Ct. at 1727. In such a circumstance, the no-probable-cause pleading requirement would not apply to a plaintiff who showed that similarly offending individuals who had not engaged in protected speech had not been arrested by that officer for the same violative conduct. Id.

38

"the no-probable-cause requirement." Id. The exception applies "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." Id. The Supreme Court stated that the plaintiff's showing of such objective evidence would address the causal concern that non-retaliatory reasons prompted the arrest and avoid a subjective inquiry into the officer's individual statements and motivations. Id. If the plaintiff makes this requisite "objective evidence" showing that others similarly situated were not arrested by the individual officer, the plaintiff's First Amendment retaliatory arrest claim may move forward "in the same manner as claims where the plaintiff has met the threshold showing of the absence of probable cause." Id.[15]

---

[15]Chief Justice Roberts wrote the opinion of the Nieves Court, joined in full by Justices Breyer, Alito, Kagan, and Kavanaugh, and by Justice Thomas in all but the part regarding the selective arrest exception. Justice Gorsuch concurred in part and dissented in part, concluding that there is no basis in law to graft a no-probable-cause requirement onto a § 1983 First Amendment retaliatory arrest claim. Nieves, 587 U.S. at __, 139 S. Ct. at 1730–31. In Justice Gorsuch's view, the absence of probable cause is not an absolute requirement for a First Amendment retaliatory arrest claim and its presence is not an absolute defense. Id. at __, 139 S. Ct. at 1732.

Nevertheless, Justice Gorsuch suggested that probable cause could bear on a retaliatory arrest claim in at least two ways: (1) to show causation; and (2) in light of separation of powers and federalism concerns where state and federal executive officials, not judges, are vested with the decision to bring criminal charges. Id. at __, 139 S. Ct. at 1732–34. As to causation, Justice Gorsuch noted the opinion's exception for evidence of selective arrests and also the open question of whether direct evidence of discrimination, such as a prosecutor's admission of discriminatory purpose, might be enough to allow a retaliatory arrest claim to proceed in cases where probable cause exists for the arrest. Id. at __, 139 S. Ct. at 1733.

To recap, the presence of probable cause will (1) defeat a § 1983 First Amendment retaliation claim for an underlying retaliatory criminal prosecution, Hartman, and also (2) will generally defeat a § 1983 First Amendment retaliation claim for an underlying retaliatory arrest, Nieves, except (a) when the "unique" five factual circumstances in Lozman exist together, or (b) where the plaintiff establishes retaliation animus and presents "objective evidence" that he was arrested for certain conduct when otherwise similarly situated individuals (committing the same conduct) had not engaged in the same sort of protected speech and had not been arrested, Nieves. While these Supreme Court decisions provide significant guidance, the Supreme Court has not addressed a § 1983 First Amendment claim predicated on a retaliatory civil lawsuit. Although there is scant circuit precedent, we discuss those few decisions because they demonstrate how circuit courts have assessed what a plaintiff must prove to establish the required causal connection in § 1983 First Amendment retaliation cases when predicated on civil lawsuits.

## G.    Other Circuit Precedent

We have located only three circuit decisions involving § 1983 First Amendment retaliation claims predicated on a retaliatory civil lawsuit or counterclaim. See Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Wash. Indus. Dev. Agency, 77 F.3d 26 (2d Cir. 1996) (counterclaim); Harrison v.

40

Springdale Water & Sewer Comm'n, 780 F.2d 1422 (8th Cir. 1986) (counterclaim); Bell v. Sch. Bd. of Norfolk, 734 F.2d 155 (4th Cir. 1984) (civil declaratory judgment action). Although Mt. Healthy was decided in 1977 well before these decisions, two of them, Harrison and Bell, do not cite Mt. Healthy. And, of course, all three cases were decided long before the probable cause decisions in Hartman, Lozman, and Nieves. Nonetheless, each of the three circuits gave some consideration to whether the underlying civil action was frivolous in deciding whether the § 1983 plaintiff had shown the requisite causation between the defendant's retaliatory animus and the plaintiff's injury.

For example, in Greenwich, the plaintiffs filed a state court lawsuit against a county government and other defendants in an effort to stop a waste incinerator project. Greenwich, 77 F.3d at 28. The plaintiffs' lawsuit caused the market for the municipal bonds (to fund the project) to deteriorate. Id. The defendants filed various state tort counterclaims against the plaintiffs. Id. at 29. The Greenwich plaintiffs then filed a separate § 1983 First Amendment retaliation claim, alleging the defendants' state court counterclaims were filed in retaliation to the plaintiffs' exercise of their protected First Amendment rights. Id. The jury agreed, but the Second Circuit remanded for a new trial.

As to causation, the Second Circuit concluded that the § 1983 plaintiffs had shown that the defendants "would not have filed their state court counterclaims

41

'but for' the Greenwich plaintiffs' filing of their state court lawsuit." Id. at 31

(applying the Mt. Healthy causation test).  However, the Second Circuit held that

the § 1983 plaintiffs were also "required to persuade the jury that the [defendants']

counterclaims were filed, not as a legitimate response to litigation, but as a form of

retaliation, with the purpose of deterring the [plaintiffs'] exercise of First

Amendment freedoms."  Id. (emphasis added).  The Second Circuit posited that

one way the plaintiffs could prove that the defendants acted with a retaliatory

purpose was to show that the defendants' state court counterclaims were

"frivolous."  Id. at 31 n.5.  The Second Circuit determined that the district court

erred by omitting from the jury charge "the element of retaliatory intent in

describing what the Greenwich plaintiffs had to prove.  Id. at 33[16]; see also

Gorman-Bakos v. Cornell Coop Extension of Schenectady Cty., 252 F.3d 545, 556

(2d Cir. 2001).

Similarly, in evaluating the plaintiffs' First Amendment retaliation claim in

Harrison, the Eighth Circuit considered whether the defendant's counterclaim was

frivolous.  Harrison, 780 F.2d at 1424.  The plaintiffs had sued the defendant

Sewer Commission in state court for injunctive relief and damages from sewage

---

[16]The Second Circuit noted that the defendants "do not advance, nor do we consider, the argument that they may not be held liable for filing their counterclaims under the theory that such liability would impair their own First Amendment rights to conduct legitimate litigation." Greenwich, 77 F.3d at 33 n.6.

42

discharge in the creek near their blueberry farm.  Id.  The Commission filed a

counterclaim to condemn and take the plaintiffs' property.  Id.  The plaintiffs then

filed a separate § 1983 action in federal court, contending that the Commission's

condemnation counterclaim was filed in retaliation for the plaintiffs' bringing their

state court lawsuit against the Commission.  Id. at 1425, 1428.[17]

Reversing the district court's dismissal, the Eighth Circuit held that the

plaintiffs had stated a § 1983 cause of action for infringement of their First

Amendment "right of access to the courts."  Id. at 1426–28.  Pivotal to the Eighth

Circuit's ruling was the fact that, notwithstanding its filing of a state court

condemnation counterclaim to take plaintiffs' property, the Commission in fact had

no plan to use the plaintiffs' property, but instead the counterclaim "was filed as a

tactical move" to pressure the plaintiffs into settling their civil damages lawsuit

against the Commission.  Id. at 1428.  To the Eighth Circuit, these facts rendered

the Commission's counterclaim "frivolous."  Id. at 1428.

In Bell, the Fourth Circuit similarly considered whether the defendant school

board's prior civil action was a legitimate or "genuine" strategy in assessing a

plaintiff's subsequent § 1983 First Amendment retaliation claim.  Bell, 734 F.2d at

156, 157 n.6.  In Bell, at a public meeting, the plaintiff opposed the school board's

---

[17]The Sewer Commission was a public agency created by the City of Springdale, Arkansas.  Harrison, 780 F.2d at 1424.

new neighborhood plan.  Id.  The school board filed a declaratory judgment suit

naming the plaintiff as a representative of the class opposed to the new plan.  Id.

The plaintiff objected to being a class representative and requested dismissal.  Id.

The school board agreed to the dismissal.  Id. at 156–57.  The plaintiff then filed a

§ 1983 action alleging the school board's suit was brought to deter her from

speaking out against the school plan.  Id. at 157.

Affirming the district court's dismissal of plaintiff's § 1983 action, the

Fourth Circuit pointed out that (1) when the plaintiff advised she did not want to be

a class representative, the board dismissed her, and (2) the board's declaratory

judgment lawsuit "appears to have been part of a genuine strategy aimed at

acquiring a court determination of the validity of the plan."  Id. at 157 & n.6.[18]

---

[18]The Town also cites the Fifth Circuit's decision in Johnson v. La. Dep't of Agric., 18 F.3d 318, 309 (5th Cir. 1994), but the underlying prosecution in that First Amendment retaliation case reads more like a criminal prosecution, than a civil action.  In that case, the plaintiff Johnson operated a crop-dusting business, and the Louisiana Department of Agriculture ("Department") charged the plaintiff with violations of pesticide laws, imposed penalties and revoked the plaintiff's license to apply pesticides.  Id. at 319–20.  The plaintiff appealed to a Louisiana state court where the liability findings were generally affirmed although the sanctions were often reduced.  Id. at 320.  Later, plaintiff Johnson filed a § 1983 First Amendment retaliation claim, alleging the Department and others had prosecuted him in retaliation for his protected speech and because he refused to make a large enough contribution to the Agriculture commissioner's reelection campaign.

On appeal, the Fifth Circuit analyzed plaintiff Johnson's § 1983 First Amendment claim predicated on retaliatory administrative proceedings as one for malicious prosecution in violation of his First Amendment rights.  Id.  In affirming the dismissal of plaintiff's § 1983 First Amendment retaliation claim, the Fifth Circuit said that, "if the First Amendment protects against malicious prosecution," plaintiff Johnson "must not only allege a deprivation of a constitutional right but must also establish all the elements of the common law tort action" of malicious prosecution.  Id.  The Fifth Circuit affirmed because plaintiff Johnson had "failed to

In sum, even before the probable cause decisions in <u>Hartman</u> and <u>Nieves</u>, other circuits were considering whether the underlying civil lawsuit was frivolous before allowing a plaintiff to move forward on a § 1983 First Amendment retaliation claim predicated on that civil lawsuit. With this extensive background, we return to this case.

### III.    ISSUES ON APPEAL

The parties primarily focus on two issues: (1) whether plaintiff DeMartini in her § 1983 First Amendment retaliation claim predicated on an underlying civil lawsuit is required to plead and prove the absence of probable cause for that civil lawsuit; and (2) if so, whether the Town lacked probable cause to initiate its civil RICO lawsuit against DeMartini.

DeMartini argues that her § 1983 First Amendment retaliation claim is governed by <u>Lozman</u>, which held that plaintiff Lozman could bring a § 1983 First Amendment retaliation claim for retaliatory arrest even though there was probable cause for his arrest. DeMartini contends that the circumstances of her case are like those in <u>Lozman</u> because the record amply demonstrates the Town adopted an official municipal policy of retaliation against her. DeMartini argues <u>Hartman</u>'s and <u>Nieves</u>'s probable cause requirement does not apply because the Town

---

satisfy the common law requirement that 'the underlying criminal proceeding . . . terminate in the plaintiff's favor.'" <u>Id.</u> at 320–21.

unanimously voted to bring its RICO civil action "for the sole purpose of stopping the protected activity" of filing public records requests and lawsuits.

Alternatively, even if Hartman and Nieves's probable cause requirement applies, DeMartini argues that the Town lacked probable cause for its RICO lawsuit. DeMartini contends that the Town's RICO action was "baseless" and frivolous given Eleventh Circuit precedent that a threat to file a civil lawsuit is not a valid RICO predicate.

Not surprisingly, the Town responds that the "causation landscape" here is more similar to that in Hartman because attorneys here functioned in the same role as that of a prosecutor in Hartman. Just as the dual actors in Hartman, the individuals filing the civil lawsuit (outside counsel) were not the same individuals allegedly harboring the animus (the Town's Commissioners). The Town also stresses, however, that the Supreme Court limited Lozman to its unique factors, several of which are missing here. And like the Supreme Court did in Nieves, this Court should look to the closest common law analog to DeMartini's First Amendment retaliation claim based on a civil lawsuit, which is a claim for "wrongful institution of legal process" and also requires proving the want of probable cause.

If DeMartini is correct that the Town lacked probable cause to file its civil RICO lawsuit, we would not have to address whether the presence of probable

46

cause defeats DeMartini's § 1983 First Amendment retaliation claim as a matter of law.  Thus, we first examine whether the Town had probable cause to file its civil RICO lawsuit.

## IV. TOWN'S PROBABLE CAUSE FOR ITS CIVIL LAWSUIT

"Probable cause to institute civil proceedings requires no more than a 'reasonabl[e] belie[f] that there is a chance that [a] claim may be held valid upon adjudication.'"  Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 62–63, 113 S. Ct. 1920, 1929 (1993) (alternations in original) (quoting Restatement (Second) of Torts § 675, cmt. E (Am. Law Inst. 1977)). Therefore, "it is not necessary to show that the instigator of a lawsuit was certain of the outcome of the proceeding, but rather that he had a reasonable belief, based on the facts and circumstances known to him, in the validity of the claim." Mee Indus. v. Dow Chem. Co., 608 F.3d 1202, 1211 (11th Cir. 2010) (quotation marks omitted).  This standard, which requires less certainty than probable cause as defined in the criminal context, is "not a high bar to meet." Id. at 1218.

To establish a RICO violation under §§ 1962(c) and 1964(c), the Town had to prove that DeMartini engaged in "an enterprise . . . through a pattern . . . of racketeering activity that included at least two racketeering acts" that caused injury to the Town's "business or property." See Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1348 (11th Cir. 2016) (quotations omitted).  For RICO purposes, a

47

"racketeering act" must constitute a violation of one of the laws described in 18 U.S.C. § 1961(1). Raney, 370 F.3d at 1087. Those laws include extortion, mail fraud, and wire fraud, among other crimes. 18 U.S.C. § 1961(1). In support of its RICO action, the Town alleged that the RICO co-conspirators had engaged in (1) extortion as defined by the Hobbs Act, 18 U.S.C. § 1951, and (2) mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343.

Importantly, prior to filing its RICO action, the Town obtained substantial information that supported a reasonable belief that CAFI, O'Boyle, the O'Boyle Law Firm, and other individuals—including DeMartini— had committed fraud through their participation in an extortionate scheme involving fraudulent public records requests, false settlement demands, and subsequent multiple lawsuits designed to obtain attorney's fees as opposed to the requested records. See Mee, 608 F.3d at 1211. Specifically, upon resigning as Executive Director of CAFI, Chandler provided sworn testimony to Sweetapple, the Town's special counsel, indicating that CAFI, O'Boyle, the O'Boyle Law Firm, and DeMartini were engaged in a fraudulent and unlawful effort to extort money from the Town via a public records litigation "windfall scheme." As described by Chandler, the scheme involved two steps: (1) pummeling the Town with voluminous and intentionally vague public records requests that were designed to elicit either no response, an incomplete response, or an untimely response, and then (2) demanding that the

48

Town pay an excessive settlement to avoid litigation under Florida's public records law, including demanding attorney's fees in excess of the fees and costs the O'Boyle Law Firm actually incurred to settle the case.

Furthermore, Chandler specifically implicated DeMartini in the scheme, describing to special counsel Sweetapple her key role within CAFI and the O'Boyle Law Firm, her importance to O'Boyle's operations, and her direct participation in the extortionate activities.

DeMartini does not dispute that employees of CAFI and the O'Boyle Law Firm dumped thousands of public records requests on the Town—costing the Town $370,000 in attorney's fees. For a Town of about 1,000 people, those attorney's fees equaled about $370 per resident. Nor does DeMartini contest that the Town had hired an attorney—Gerald Richman—who investigated the O'Boyle-led scheme for over a year. Nor does DeMartini contest that the Town's investigation kicked into high gear when Chandler left his post as CAFI's Executive Director and reported his concerns about CAFI's fraudulent scheme to Town officials in extensive written and videotaped statements. And DeMartini does not dispute that Chandler gave detailed insight into the scheme, including that CAFI was deliberately making vague public records requests so that the O'Boyle Law Firm could garner thousands of dollars in attorney's fees.

49

Likewise, DeMartini fails to contest certain details concerning what the Town knew about her personal involvement in CAFI's scheme. For example, DeMartini does not contest that she participated in the O'Boyle-led scheme, with O'Boyle describing her as his "left hand." Indeed, Chandler provided the Town with emails showing DeMartini's alleged role at CAFI and the O'Boyle Law Firm. Nor does DeMartini deny that Chandler informed the Town's officials that DeMartini was pressuring him to come up with 25 lawsuits per week and chastised him for his proposal to refer CAFI's work to other law firms besides the O'Boyle Law Firm. Nor does DeMartini deny that Chandler told the Town that he was troubled by CAFI's policy that permitted DeMartini—a non-lawyer—to authorize public record requests and litigation.

Instead, DeMartini makes two primary objections to the district court's finding that the Town had probable cause to file its civil RICO lawsuit: (1) the Town should not have relied on Chandler's sworn testimony because he might not be viewed as a credible witness in the case; and (2) settled precedent in the Eleventh Circuit clearly established that frivolous litigation can never serve as a Hobbs Act violation, even if the plaintiff was using the litigation for extortionate purposes. Neither contention has merit.

As to the first objection, while it is true that the Town might rightly have considered how a jury might view Chandler's testimony in a RICO lawsuit—given

50

that he was previously a vocal supporter of public records requests and had sued

municipalities for public records requests in his past role as a director at CAFI—

the Town and its outside counsel never questioned Chandler's veracity or

reliability about the inner workings of CAFI.  And it was this inside-knowledge

that gave great heft to the Town's allegations in its RICO complaint.  Indeed, given

that Chandler had worked as CAFI's Executive Director, he had first-hand

knowledge of O'Boyle and DeMartini's scheme, and his affidavits corroborated

much of what the Town had already suspected after being the target of over a

thousand public records requests from CAFI.  Accordingly, because Chandler had

a strong basis for his personal knowledge, the Town reasonably relied on his sworn

statements to form their reasonable belief that the whole scheme was designed

solely to extort monies from the public coffers.

    As to DeMartini's second objection, she argues that this Court's precedent in

Pendergraft and Raney precluded the Town's theory that a RICO action could be

based on DeMartini's litigation activity, and thus eliminated any probable cause it

may have had for asserting a RICO claim.  We reject DeMartini's argument.

Pendergraft and Raney made it unlikely, but not impossible, for the Town to

succeed.  The Town had a reasonable belief that there was a legitimate and

material distinction between their RICO claim and the ones that came before it in

that O'Boyle, DeMartini, and others had abused their statutory right to request

51

public documents from the government "on a grand scale." Gulf Stream, 654 F. App'x at 444. Given the huge number of requests and the obvious pattern that they were being filed to strip the Town of money while allowing the O'Boyle Law Firm to profit handsomely, it was not unreasonable for the Town to believe in good faith that this Court might carve out an exception to the general rule. See Prof'l Real Estate Inv'rs., 508 U.S. at 65, 113 S. Ct. at 1930–31 ("Even though it did not survive PRE's motion for summary judgment, Columbia's copyright action was arguably 'warranted by existing law' or at the very least was based on an objectively 'good faith argument for the extension, modification, or reversal of existing law.'" (quoting Federal Rule of Civil Procedure 11)). In fact, the Town cited to out-of-circuit caselaw in which actual or threatened litigation was acknowledged to be a component of the activities giving rise to a RICO claim. Moreover, distinguishing existing precedent is the essence of good lawyering. See Armco, Inc. v. S. Rock, Inc., 778 F.2d 1134, 1138 (5th Cir. 1985) (finding that the defendant had probable cause to file a civil lawsuit because, even though it suspected "it would eventually lose," the defendant plausibly distinguished existing case law). The Town had a mountain of fraudulent and extortionate conduct to present in the hopes of creating an exception to the general rule in Pendergraft and Raney. Consequently, there is no merit to DeMartini's contention that the Town lacked a reasonable belief that it might prevail in the RICO lawsuit.

52

Simply put, the Town did not need to be certain of success on its civil RICO claim in order to have probable cause to assert it. See Mee, 608 F.3d at 1211. Our inquiry is whether all of the facts and circumstances available to the Town—including Chandler's extensive sworn testimony—gave the Town a reasonable belief that it had a tenable RICO claim against DeMartini. Id. We conclude the Town had such a reasonable belief.

Although the district court and this Court ultimately rejected the Town's proffered distinction, its argument was not unreasonable, as probable cause may be based on "an objectively 'good faith argument for the extension, modification, or reversal of existing law.'" See Prof'l Real Estate Inv'rs, 508 U.S. at 65, 113 S. Ct. at 1930–31. Consequently, the Town had a reasonable basis to believe its claim was valid.[19]

Indeed, while this Court affirmed on appeal the district court's dismissal of the Town and Wantman's civil RICO complaint, we denied the defendants' motion for sanctions under Federal Rule of Appellate Procedure 38. Gulf Stream, 654 F. App'x at 445 n.7. Rule 38 provides that "[i]f a court of appeals determines that an appeal is frivolous, it may . . . award just damages and single or double costs to the

---

[19]We note that our prior panel decision now having decided that a civil RICO claim does not lie here based on the facts of this case, the Town would presumably lack probable cause should it seek again to file another civil RICO lawsuit against persons filing public records requests and related lawsuits, even if the requests were filed in bad faith with the motivation behind the claims being to extort money.

appellee." Fed. R. App. P. 38. In so ruling, we rejected defendants' argument that the appeal was frivolous in light of Pendergraft and Raney. Gulf Stream, 654 F. App'x at 445 n.7. For all of these reasons, we conclude that the Town had probable cause to file the civil RICO lawsuit.

## V.    WHETHER PROBABLE CAUSE DEFEATS DEMARTINI'S RETALIATION CLAIM

Because the Town had probable cause to file its civil RICO lawsuit, we must answer the final question: whether the existence of probable cause for a civil lawsuit defeats a § 1983 First Amendment retaliation claim predicated on that underlying civil lawsuit.

Based on the factors discussed in the Supreme Court's Hartman and Nieves decisions, we conclude that, as with § 1983 First Amendment retaliation claims arising in the criminal prosecution and arrest context, the presence of probable cause will generally defeat a § 1983 First Amendment retaliation claim based on a civil lawsuit as a matter of law. See Hartman, 547 U.S. at 260–61, 265–66, 126 S. Ct. at 1704, 1706–07; Nieves, 587 U.S. at __, 139 S. Ct. at 1726. This principle will particularly be apt when the alleged retaliatory civil ligation by the government is itself taken as a reasonable response to the plaintiff's own litigation, or threat of litigation, against the government. Just as a citizen may have the right

54

to sue the government, the government likewise has the right, and duty, to engage in legitimate responsive litigation to defend itself against such challenges.

In a First Amendment claim predicated on a retaliatory civil lawsuit by the government, the causation landscape is akin to that in Hartman because an attorney (whether in-house or outside counsel) has filed the underlying civil lawsuit. Notably, before taking action here, the Town engaged attorneys to investigate CAFI, O'Boyle, and DeMartini's public records scheme. The involvement of counsel widens the causation gap between any alleged retaliatory animus by the Town and DeMartini's injury. Counsel's pivotal role in advising the Town that it had a good faith basis to sue supports a requirement that DeMartini show the absence of probable cause for the Town's underlying lawsuit in order to establish that the Town's alleged animus caused DeMartini's injury. Like the prosecutor in Hartman who filed the criminal action, the individuals recommending and filing the civil lawsuit here (counsel) were not the same individuals who allegedly harbored the retaliatory animus (the Town's Commissioners).

In fact, two separate outside attorneys, Robert Sweetapple and Gerald Richman, conducted investigations, evaluated the facts, and only then independently recommended the filing of the civil RICO lawsuit. Like the prosecutor in Hartman, Sweetapple and Richman were obligated to exercise their own individual judgment and were bound by the Florida Rules of Professional

55

Conduct. Specifically, they were each (1) required to "exercise independent professional judgment and render candid advice" to the Town, (2) limited to the filing of a claim having "a basis in law and fact . . . that is not frivolous," and (3) prohibited from "us[ing] the law's procedures . . . to harass and intimidate others." See R. Reg. Fla. Bar, 4-2.1, 4-3.1, Preamble.

Counsel's investigation, legal recommendation, and filing of the RICO lawsuit widen the causal gap between the Town's alleged animus and DeMartini's injury. At bottom, as in Hartman, difficulty in proving the more complex chain of causation here supports a conclusion that a lack of probable cause is a necessary element in DeMartini's § 1983 First Amendment retaliation claim. As in retaliatory criminal prosecution cases, the absence of probable cause is necessary to bridge the gap between the defendant's alleged animus and plaintiff's injury. See Hartman, 547 U.S. at 259, 126 S. Ct. at 1703 ("[T]he need to prove a chain of causation from animus to injury, with details specific to retaliatory-prosecutions cases, . . . provides the strongest justification for the no-probable-cause requirement."). And as in Hartman, the absence of probable cause will have high probative force and adds little to no cost, as the facts surrounding the Town's prior civil RICO lawsuit are already known by DeMartini.

In addition, in § 1983 First Amendment cases predicated on a retaliatory civil lawsuit, the fact that probable cause existed to bring the underlying civil

56

lawsuit shows that the defendant had a legitimate interest in considering the plaintiff's speech in the first place. For example, here, the protected speech that the Town allegedly retaliated against here—the nearly 2,000 abusive public records requests and 36 lawsuits—was the same conduct (or protected speech) for which the Town had its own legitimate, objective reasons and motivation for challenging by filing its civil RICO lawsuit. Unlike in other retaliation cases, in addition to having legal probable cause for its civil RICO lawsuit, the Town had a legitimate, objective factual reason and motivation for considering CAFI and DeMartini's public records requests and lawsuits in deciding to file the civil RICO lawsuit. The Town's action was made in response to what it reasonably believed were the abusive intent and practices underlying CAFI and DeMartini's harassing public records requests and related lawsuits. While public records requests and lawsuits typically constitute protected speech under the First Amendment, here the Town had a legitimate interest and motivation in protecting itself, its coffers, and its taxpaying citizens—independent of any motivation to retaliate—by litigation against CAFI and DeMartini.

To that end, it is clear that: (1) CAFI had filed nearly 2,000 public records requests and 36 lawsuits; (2) its requests were not designed to actually obtain the records but to enable CAFI to obtain money through settlements and excessive attorney's fees; and (3) the Town had spent $370,000 in attorney's fees in

responding to CAFI's requests and lawsuits, which were bleeding the Town's coffers dry, one abusive lawsuit at a time. Nor is this a case where the government was attempting to thwart a citizen from using public records laws to prevent the citizen from validly obtaining public information. Neither CAFI nor DeMartini have pointed to any public information that the Town ever withheld or that they were unable to obtain. Rather, given CAFI and DeMartini's sustained pattern of abusive requests and lawsuits, the Town's elected officials had a legitimate, objective reason to take legal action in response to CAFI's conduct—conduct that it reasonably believed was part of an illegal and fraudulent scheme to improperly extort settlement money and attorney's fees.

Further, that DeMartini's protected speech was a "wholly legitimate consideration" for the Town when deciding to file the civil RICO lawsuit also renders the causation landscape more complex, just like it did in Nieves. Indeed, as the Supreme Court recognized in Nieves, where protected speech is a "wholly legitimate consideration" for the government when deciding to act, as when a subject's speech is itself a proper basis for the arrest, "the causal inquiry is complex," such that, generally speaking, probable cause is a necessary element of a retaliatory arrest claim. See Nieves, __ U.S. at __, 139 S. Ct. at 1723–24 (internal quotation marks omitted). Here, in considering its available litigation responses to DeMartini, the Town necessarily had to consider her record requests and

58

lawsuits—protected speech though it may be—and the surrounding circumstances. Therefore, like in <u>Nieves</u>, the causal complexity warrants that a plaintiff, like DeMartini, must plead and prove the absence of probable cause for her First Amendment retaliation claim to move forward. Otherwise, it would be extremely difficult, if not impossible, to determine whether the filing of the RICO lawsuit was caused by the Town's legitimate consideration of the protected speech, its alleged retaliatory animus, or both.

This type of First Amendment retaliation case—one predicated on an underlying civil lawsuit that the government had probable cause to bring—requires our Court to address the intersection of (1) the fundamental principles that prohibit the government from retaliating against a citizen for exercising her First Amendment rights to free speech and to petition the government for redress; and (2) other principles that define a government's access to the court to file lawsuits to remedy wrongs on behalf of its citizens. That CAFI's fraudulent scheme involved conduct protected by the First Amendment does not, in and of itself, mean that § 1983 automatically exposed the Town to strict liability civil damages because it took action to protect itself from that fraud. The imposition of strict liability on the government when the government has legitimate and objective reasons, based on probable cause, to initiate the underlying lawsuit is not warranted, as outlined above.

59

For all of these reasons, we conclude that applying the objective, lack-of-probable-cause requirement to a § 1983 First Amendment retaliation case predicated on the filing of a civil lawsuit is appropriate because it strikes the proper balance between protecting a plaintiff's important First Amendment rights while, at the same time, ensuring that the Town has a similar ability to access the courts to protect itself and its citizens from non-meritorious litigation.  Therefore, the presence of probable cause will generally defeat a plaintiff's § 1983 First Amendment retaliation claim predicated on an underlying civil lawsuit, or counterclaim for that matter.

Lastly, we must discuss whether there are possible exceptions to this general rule.  To date, the Supreme Court has not identified any exceptions to the no-probable-cause requirement in § 1983 First Amendment retaliation claims predicated on criminal prosecutions.  Arguably, retaliation claims predicated on prior civil lawsuits would not be subject to exceptions either.

We recognize, however, that the Supreme Court has, in two cases, identified potential exceptions to the no-probable-cause requirement in § 1983 First Amendment retaliation claims predicated on a criminal arrest.  First, in Nieves, the Supreme Court acknowledged a potential exception when a retaliatory-arrest plaintiff not only establishes the arresting officer's retaliatory animus but also presents objective evidence that the plaintiff was arrested when people who had

60

committed the same conduct, but who had not engaged in the same sort of protected speech, had not been arrested by that officer. Nieves, 587 U.S. at __, 139 S. Ct. at 1727. Second, in Lozman, the Supreme Court delineated five "unique" factual circumstances, which, if proven, would combine together to create an exception to the general no-probable-cause requirement for a plaintiff bringing a First Amendment retaliation claim predicated on retaliatory arrest. Lozman, 585 U.S. at __, __, 138 S. Ct. at 1949, 1954–55.

Whatever role these exceptions, articulated in a retaliatory arrest context, might play in a case in which the plaintiff is alleging that a retaliatory civil lawsuit has been filed against her, it is clear they play no role here. As to any Nieves exception, there is no claim or evidence that other individuals engaged in similar conduct, without ramifications, as did DeMartini and CAFI when they carried out the fraudulent public records request scheme.

And, in any event, Lozman is so materially different from this case that its five-pronged exception would not apply either. Pivotal factual ingredients to Lozman's holding are missing here. In Lozman, the speech allegedly retaliated against—the prior open meeting lawsuit and criticisms of city officials—occurred five months earlier and was not the same conduct that, the defendant City claimed, gave rise to Lozman's arrest. See id. at __, __, 138 S. Ct. at 1949, 1954–55. The Lozman Court found this fact persuasive because it circumvented the difficulties in

61

the type of retaliation claims the Supreme Court had been concerned about, that is, arrests very close in time to the protected speech, where it would be difficult, if not impossible, to tell whether the arrest "was caused by the officer's legitimate or illegitimate consideration of speech."[20]  Id. at __, 138 S. Ct. at 1953.

Because the speech the Town allegedly retaliated against here—the public records requests and subsequent lawsuits—was the same protected speech for which the Town filed a civil lawsuit supported by probable cause, DeMartini's retaliation claim is precisely the type of claim that the Supreme Court in Lozman was concerned would prove indecipherable for purposes of proving causation and therefore would create a serious risk of "dubious" First Amendment retaliatory claims.  See id.

In addition, the Supreme Court assumed for purposes of its decision that the City's ordering of Lozman's arrest was not a legitimate response to Lozman's five-months-earlier open meetings lawsuit and criticisms.  As the Supreme Court explained, "it is difficult to see why a city official could have legitimately considered [at the time of arrest] that Lozman had, months earlier, criticized city officials or filed a lawsuit against the City."  Id. at __, 138 S. Ct. at 1954.  In contrast, the Town here had a legitimate, non-retaliatory litigation purpose in

---

[20]The separation in time and type of conduct would purportedly allow the jury to readily decide if plaintiff Lozman's arrest was due to Lozman's conduct at the meeting or due to Lozman's prior lawsuit and criticisms five months earlier.

62

considering CAFI and DeMartini's public records requests and lawsuits at the time it filed its civil RICO lawsuit.  Namely, to stem the hemorrhaging of public resources that DeMartini's bad faith requests had caused.  Further, the Town engaged attorneys who investigated, recommended, and filed the Town's RICO lawsuit.  There was no similar counsel in Lozman to complicate the causation chain.

Accordingly, because the factual circumstances in Lozman are so materially distinguishable from this case and because the Supreme Court carefully limited its Lozman decision to its "unique facts," we conclude that Lozman's exception to the no-probable cause requirement does not help DeMartini's First Amendment retaliation claim, even if it were potentially applicable.

For all of these reasons and under the totality of the circumstances, we conclude that DeMartini has not shown that the district court erred in granting summary judgment to the Town on her § 1983 First Amendment retaliation claim predicated on the Town's civil RICO lawsuit.[21]

_____

[21] Separate from the elements of a First Amendment retaliation claim, all plaintiffs who sue a municipality under § 1983 must show that execution of the municipality's policy or custom caused the alleged injury.  Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 694–95, 98 S. Ct. 2018, 2037-38 (1978); see also Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S. Ct. 1292, 1298 (1986) (explaining that, in order to recover under § 1983, the plaintiff suing the municipality must show that the "municipality has officially sanctioned or ordered" the action causing the alleged injury).  A plaintiff may show a municipality's policy or custom in several ways, including (1) showing the municipality's action was "an official policy enacted by [the municipality's] legislative body"; (2) demonstrating that a "final policymaker[] . . . acquiesced in a longstanding practice that constitutes the entity's standard operating procedure; or (3) proving

Our conclusion—that probable cause generally defeats a First Amendment retaliation claim predicated on an underlying civil lawsuit—is also confirmed by common-law doctrine. The Supreme Court has instructed that, "[w]hen defining the contours of a claim under § 1983, we look to common-law principles that were well settled at the time of its enactment." Nieves, 587 U.S. at __, 139 S. Ct. at 1726 (quotation marks omitted); Manuel v. City of Joliet, Ill., 580 U.S. at __, 137 S. Ct. 911, 921 (2017) (stating that common-law principles guide the definition of § 1983 claims); Kalina v. Fletcher, 522 U.S. 118, 123, 118 S. Ct. 502, 506 (1997) (examining common-law doctrine when identifying the elements of the § 1983 cause of action and defenses available to state actors).

The Supreme Court has told us that when § 1983 was enacted in 1871, there was no common-law tort for retaliatory arrest based on First Amendment protected speech, and thus we should look to the common-law torts that provide the "closest analogy" to such retaliatory arrest claims. See Nieves, 587 U.S. at __, 139 S. Ct. at 1726 (internal quotation marks omitted). In Nieves, rather than deciding whether a common-law malicious prosecution claim or a false imprisonment claim was the

---

"a subordinate public official [made] an unconstitutional decision" that was "then adopted by someone who does have final policymaking authority." Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016) (quotation marks omitted).

In this case, DeMartini relies on the first method to proceed against the Town under Monell. Because our probable cause holding decides this case, we need not, and do not, address whether the Town's vote did or did not satisfy the threshold Monell showing of an existence of an official policy.

better analog to a retaliatory arrest claim, the Supreme Court concluded that the presence of probable cause defeated both types of claims at common law and would generally defeat a First Amendment retaliatory arrest claim.  Id. at __, 139 S. Ct. at 1726–27.

Similarly, in DeMartini's case, there was no common-law tort for a First Amendment retaliatory civil lawsuit claim when § 1983 was enacted.  Yet Nieves's guidance leads us to ask what "common law tort[] . . . provide[s] the 'closest analogy'" to a § 1983 First Amendment retaliation claim predicated on an underlying retaliatory civil lawsuit?  See Nieves, 587 U.S. __, 139 S. Ct. at 1726 (quoting Heck v. Humphrey, 512 U.S. 477, 484, 114 S. Ct. 2364, 2371 (1994)).

The closest analogy to DeMartini's § 1983 First Amendment retaliation claim is a "wrongful civil proceedings" claim.  See Prof'l Real Estate Inv'rs, 508 U.S. at 62, 113 S. Ct. at 1929.  As the Supreme Court has explained, "[t]he notion of probable cause, as understood and applied in the commonlaw tort of wrongful civil proceedings, requires the plaintiff to prove that the defendant lacked probable cause to institute an unsuccessful civil lawsuit and that the defendant pressed the action for an improper, malicious purpose."  Id.  Likewise, the Restatement (Second) of Torts defines the tort of wrongful civil proceedings as:

> One who takes an active part in the initiation, continuation or procurement of civil proceedings against another is subject to liability to the other for wrongful civil proceedings if (a) he acts without

65

probable cause, and primarily for a purpose other than that of securing the proper adjudication of the claim in which the proceedings are based, and (b) except when they are ex parte, the proceedings have terminated in favor of the person against whom they are brought.

§ 674 (Am. Law. Inst. 1977) (emphasis added).

It has long been settled law, and DeMartini does not dispute, that wrongful civil proceedings claims require proving the absence of probable cause. See T. Cooley, Law of Torts 187-89 (1879); Prof'l Real Estate Inv'rs, 508 U.S. at 63, 113 S. Ct. at 1929 ("Because the absence of probable cause is an essential element of the tort, the existence of probable cause is an absolute defense." (citing Crescent City Live Stock Co. v. Butchers' Union Slaughter–House Co., 120 U.S. 141, 149, 7 S. Ct. 472, 476 (1887)). Our holding here—that probable cause defeats DeMartini's § 1983 First Amendment retaliation claim—is also consistent with, and supported by, this common law.

## VI.    FLORIDA MALICIOUS PROSECUTION

On appeal, DeMartini also argues that the district court erred in granting summary judgment to Wantman on her malicious prosecution claim under Florida law. Although DeMartini agrees that the "lack of probable cause" is a necessary element of a Florida malicious prosecution claim, she nevertheless argues that Wantman lacked such probable cause to file the civil RICO lawsuit against her.

66

To prevail on a common-law tort of malicious prosecution under Florida

law, a plaintiff must establish the following elements:

(1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding against the present plaintiff as the defendant in the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damage as a result of the original proceeding.

Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352, 1355 (Fla. 1994) (emphasis

added); Durkin v. Davis, 814 So. 2d 1246, 1248 (Fla. Dist. Ct. App. 2002); see

Paez, 915 F.3d at 1291–92 (discussing these same elements of the common-law

tort of malicious prosecution available under Florida law).  The failure of a

plaintiff to establish any one of these six elements is fatal to a claim of malicious

prosecution.  Mancusi, 632 So. 2d at 1355.  Thus, as a necessary element, the

existence of probable cause will defeat a claim for malicious prosecution.  Id.

Under Florida law, to show probable cause to initiate a civil proceeding, "it

is not necessary to show that the instigator of a lawsuit was certain of the outcome

of the proceeding, but rather that he had a reasonable belief, based on facts and

circumstances known to him, in the validity of the claim."  Wright v. Yurko, 446

So. 2d 1162, 1166 (Fla. Dist. Ct. App. 1984).  Stated another way, "the instigator

must have had '[a] reasonable ground of suspicion, supported by circumstances

67

sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.'" Mee, 608 F.3d at 1211 (alteration in original) (quoting Goldstein v. Sabella, 88 So. 2d 910, 911 (Fla. 1956)).  A lack of probable cause can be shown "[w]here it would appear to a 'cautious man' that further investigation is justified before instituting a proceeding," and such investigation is not undertaken.  Harris v. Lewis State Bank, 482 So. 2d 1378, 1382 (Fla. Dist. Ct. App. 1986).

In the context of a civil suit, probable cause is "measured by a lesser standard than in a criminal suit."  Wright, 446 So. 2d at 1166.  And the Florida Supreme Court has explained that "[w]hat facts and circumstances amount to probable cause is a pure question of law," while the existence of those facts or circumstances "in any particular case is a pure question of fact."  City of Pensacola v. Owens, 369 So.2d 328, 330 (Fla. 1979) (internal quotation marks omitted).

Here, the district court properly granted summary judgment to Wantman on DeMartini's malicious prosecution claim because Wantman, like the Town, had probable cause to file the RICO suit against her.  It is undisputed that: (1) Gerald Richman represented the Town and Wantman in the lawsuit; (2) Richman investigated CAFI's fraudulent scheme at length; (3) Richman called Wantman about the lawsuit; and (4) Wantman agreed to join the Town in filing the lawsuit based on discussions with Richman.  Indeed, based on a year-long investigation,

68

including reviewing Chandler's statements, Richman had obtained substantial information that supported a reasonable belief that CAFI, O'Boyle, the O'Boyle Law Firm, and other individuals—including DeMartini—had committed fraud through their participation in an extortionate scheme involving fraudulent public records requests, false settlement demands, and subsequent multiple lawsuits designed to obtain attorney's fees as opposed to the requested records.[22]

We recognize that DeMartini stresses that Wantman's President and Federal Rule of Civil Procedure 30(b)(6) representative, David Wantman, testified at his deposition that (1) he had "no idea" who DeMartini was, and (2) aside from discussing the matter with attorney Richman, Wantman did not independently investigate DeMartini's role in CAFI's fraudulent scheme. But the fact remains that DeMartini does not dispute that Richman investigated CAFI's scheme, advised the Town and later Wantman about that scheme, and Wantman only agreed to join the lawsuit after discussions with Richman.

Arising from their attorney–client relationship, Wantman and Richman had a principal and agent relationship. See Durrett v. Jenkins Brickyard, Inc., 678 F.2d 911, 916 (11th Cir. 1982) (explaining that an attorney is his client's agent and

---

[22]As noted earlier, DeMartini also brought a claim for malicious prosecution against Gerald Richman. The district court granted summary judgment to Richman on that claim because DeMartini failed to cite evidence from which a reasonable jury could infer that Richman lacked probable cause for filing the RICO civil lawsuit. On appeal, DeMartini does not challenge that ruling.

representative).  Information obtained by an agent is imputed to the agent's principal.  See First Ala. Bank of Montgomery, N.A., First State Ins. Co., 899 F.2d 1045, 1074, 1079 (11th Cir. 1990) (stating that generally the agent's knowledge is imputed to the principal and is treated as the principal's knowledge).  Everything that Richman knew about DeMartini's role in the scheme was imputed to Wantman.  Accordingly, Wantman had probable cause to file the RICO suit against DeMartini.[23]

## VII.  CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment to the Town on DeMartini's § 1983 First Amendment retaliation claim and to Wantman on her Florida malicious prosecution claim.

**AFFIRMED.**

---

[23]The district court properly denied DeMartini's cross-motion for summary judgment against Wantman.  As described above, there is no genuine issue of material fact that Wantman had probable cause to file the RICO action.

70

ROSENBAUM, Circuit Judge, concurring:

I concur in much of the panel's well-reasoned opinion. I write separately to address the Majority Opinion only to the extent that it might be understood to suggest that probable cause supporting the filing of a civil lawsuit predicated on prior civil litigation may be all that is ever required to defeat a § 1983 First Amendment retaliation claim. *See* Maj. Op. at 60 ("To date, the Supreme Court has not identified any exceptions to the no-probable-cause requirement in § 1983 First Amendment retaliation claims predicated on criminal prosecutions. Arguably, retaliation claims predicated on prior civil lawsuits would not be subject to exceptions either."). With any such suggestion, I firmly disagree.

Presumably, the Majority Opinion bases any suggestion that a finding of probable cause may be all that is ever required in a case such as this one on *Hartman v. Moore*, 547 U.S. 250 (2006), since that is the sole alleged retaliatory criminal-prosecution case it discusses. But *Hartman* does not stand for the proposition that a showing of probable cause justifying a criminal prosecution necessarily forecloses a First Amendment retaliation claim in all cases. To the contrary, *Hartman* expressly explains that the showing of probable cause supporting a criminal prosecution "is not necessarily dispositive." *Id.* at 265. That is so because "showing . . . [the] presence [of probable cause] does not guarantee that [retaliation] was not the but-for fact in a prosecutor's decision." *Id.* Indeed, *Hartman* notes that "[a] prosecutor's

71

disclosure of retaliatory thinking on his part . . . would be of great significance . . . . So would evidence that a prosecutor was nothing but a rubber stamp for his investigative staff or the police." *Id.* at 264. Nevertheless, *Hartman* reasons, because such incidents "are likely to be rare," it makes sense for the rule to provide that probable cause supporting a criminal prosecution *generally* forecloses the viability of a First Amendment retaliation suit. *See id.*

But criminal prosecutions can result in the loss of liberty, can affect reputation, and can be costly to the person prosecuted. As a result, they can be an effective way to punish a speaker with whom the government disagrees and to chill and slow down others who would consider voicing their discontent with the government. So *Hartman* explicitly leaves the door open for First Amendment retaliation claims based on probable-cause supported criminal actions that would not have been brought but for an intent on the part of the government to retaliate against the defendant for engaging in protected First Amendment activity.

The same is true of civil lawsuits. Probable cause supporting the filing of a civil lawsuit predicated on prior civil litigation may, as a general rule, be all that is required to defeat a § 1983 First Amendment retaliation claim. But civil litigation is costly and stressful. It can also result in delays to the matters being litigated. So like a criminal prosecution, litigation can also be a highly effective way to punish and chill protected First Amendment activity.

72

To ensure that the government is never permitted to weaponize litigation to punish and chill protected speech, in every § 1983 First Amendment retaliation case involving the filing of a lawsuit in response to prior civil litigation, even though supported by probable cause, we must always at least evaluate the surrounding circumstances, keeping in mind the considerations the Supreme Court has identified in *Hartman* and in retaliatory-arrest cases such as *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018), and *Nieves v. Bartlett*, 139 U.S. 1715 (2019). Of course, the Majority Opinion did just that here, and it demonstrated why, in this case, those considerations do not warrant an exception to the general rule that probable cause supporting the filing of a lawsuit predicated on prior civil litigation defeats a § 1983 First Amendment retaliation claim. I therefore concur.

73